## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CONNIE GUMBERT,                         Case No. 1:10-cv-333
     Plaintiff                         Dlott, J.
                                        Litkovitz, M.J.

   vs


COMMISSIONER OF                         **REPORT AND**
SOCIAL SECURITY,                        **RECOMMENDATION**
    Defendant


Plaintiff brings this action pro se pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc. 16) and the Commissioner's response in opposition. (Doc. 17).

### PROCEDURAL BACKGROUND

Plaintiff Connie Gumbert was born in 1962 and was 46 years old at the time of the decision of the administrative law judge (ALJ). Plaintiff has a high school education and past relevant work experience as a construction worker and bar waitress.

Plaintiff filed applications for DIB and SSI on September 7, 2007, alleging a disability onset date of September 15, 2006, due to a back injury. Plaintiff's applications were denied initially and upon reconsideration. Plaintiff requested and was granted a de novo hearing before an ALJ. On September 23, 2009, plaintiff, who was represented by counsel, appeared and testified at a hearing before ALJ John Montgomery. A vocational expert (VE), Suman Srinivasan, also appeared and testified at the hearing.

On October 30, 2009, the ALJ issued a decision denying plaintiff's DIB and SSI applications. (Tr. 8-22). The ALJ determined that plaintiff suffers from two severe impairments: (1) degenerative disc disease of the lumbar spine, and (2) exogenous obesity. (Tr. 13). The ALJ determined that although plaintiff had been diagnosed with a dysthymic disorder[1] and alcohol abuse, these impairments were not severe within the meaning of the Social Security Regulations and Rulings. (Tr. 14). The ALJ found that plaintiff's severe impairments do not alone or in combination meet or equal the level of severity described in the Listing of Impairments. (Tr. 15). According to the ALJ, plaintiff retains the residual functional capacity (RFC) to perform light work but with the following limitations: She must alternate positions throughout the workday; she can sit for one hour at a time, with a five-minute break in between, for a total of eight hours; she can lift and/or carry 10 pounds frequently and 20 pounds occasionally; she can perform no repetitive reaching, but she can frequently reach and she can occasionally bend or squat; and she cannot climb ladders or scaffolds, but she can occasionally climb stairs and ramps. (Tr. 15). The ALJ further determined that plaintiff is unable to perform any past relevant work. (Tr. 20). Finally, in reliance on the testimony of the VE, and using Grid Rule 202.21 as a framework for decisionmaking, the ALJ determined that plaintiff is capable of performing a significant number of jobs in the national economy. (Tr. 20-21). Accordingly, the ALJ concluded that plaintiff is not disabled under the Social Security Act (SSA). (Tr. 21).

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

---

[1]Dysthymic disorder is a less severe form of depression, with symptoms which can linger for a period of two years or longer. Individuals who suffer from dysthymia are usually able to function adequately but may seem consistently unhappy. http://www.medicinenet.com/dysthymia/article.htm (last accessed June 29, 2011).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for DIB, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the SSA. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI, plaintiff must file an application and be an "eligible individual" as defined in the SSA. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be

3

expected to last for a continuous period of not less than 12 months. Plaintiff must also show that the impairment precludes her from performing the work she previously performed or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of non-disability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments. An impairment can be considered as not severe only if the impairment is a "slight abnormality" which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience. *Farris v. Sec'y of HHS,* 773 F.2d 85, 90 (6th Cir. 1985) (citation omitted). *See also, Bowen v. Yuckert,* 482 U.S. 137 (1987). If the individual does not have a severe impairment, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing, 20 C.F.R. Part 404, Subpart P, Appendix 1. The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 404.1525(a). Plaintiff's impairment need not precisely meet the criteria of the Listing in order for plaintiff to obtain benefits. It is sufficient if the impairment is medically equivalent to one in the Listing. 20 C.F.R. § 404.1520(d). To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment. 20 C.F.R. § 404.1526(a). The

4

decision is based solely on the medical evidence, which must be supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1526(b). If the impairment meets or equals any within the Listing, the Commissioner renders a finding of disability without consideration of the individual's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981). Fourth, if the individual's impairments do not meet or equal any in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1053 (6th Cir. 1983); *Kirk*, 667 F.2d at 529.

Plaintiff has the burden of proof at the first four steps of the sequential evaluation process. *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *Wilson*, 378 F.3d at 548. *See also Richardson v. Secretary of Health & Human*

*Services*, 735 F.2d 962, 964 (6th Cir. 1984).  Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability.  20 C.F.R. Subpart P, Appendix 2; *Wilson*, 378 F.3d at 548.

## MEDICAL RECORD

### I. Back Impairment

Plaintiff originally injured her back at work in July 2000, and the Ohio Bureau of Worker's Compensation allowed a lumbosacral sprain injury.  (Tr. 270, 278).  Plaintiff received treatment for her injury from a chiropractor, Jerry Sipple, D.C., until August 2000.  (Tr. 262-87).  Dr. Sipple reported that as of August 2000, plaintiff was "very close to a pre-injury status," and he advised that she withdraw from care.  (Tr. 262).  Dr. Sipple encouraged plaintiff to continue in her full-time position with a land development company.  (Tr. 263).

Plaintiff returned to Dr. Sipple for treatment in August 2006 after she re-injured her back while lifting heavy material at work.  (Tr. 205-07, 247).  Plaintiff reported pain in her lower back and neck and numbness in her legs and feet.  (Tr. 206, 247).  She stated she was in the most pain when lying down.  (Tr. 207).  Examination revealed decreased range of lumbar motion; spasms and tenderness of the lumbosacral soft tissue; decreased sensation in the L4 to S1 dermatomes, left greater than right; and positive straight leg raising.  (Tr. 247).  Plaintiff continued to treat with Dr. Sipple through April 2007, reporting improvement of her low back pain but continued pain in her legs and worsening numbness in her feet.  (Tr. 209-46).  Dr. Sipple reported that her progress was limited.  (Tr. 209).

On October 28, 2008, nearly 18 months after he had last treated plaintiff, Dr. Sipple completed an assessment of plaintiff's ability to do work-related activities in which he concluded that plaintiff was "unable to be gainfully employed." (Tr. 320-323). Dr. Sipple stated that plaintiff was not currently taking any medication because it made her nauseous. (Tr. 322). Dr. Sipple opined that due to plaintiff's low back condition combined with bilateral leg syndrome, plaintiff could lift less than 10 pounds occasionally; stand/walk less than two hours out of eight; stand for 30 minutes at a time; and sit for 30 minutes at a time and for less than two hours in a work day. (Tr. 320). Dr. Sipple opined that plaintiff needed to shift positions at will; walk around every 30 minutes for 15 minutes at a time; and lie down at unpredictable intervals at least twice during a work day. *(Id.)* Dr. Sipple reported that plaintiff could never twist or climb ladders or stairs; she could occasionally stoop and crouch; and she was limited in reaching, pushing/pulling, handling and feeling. She could not perform fine finger manipulations. Dr. Sipple reported that plaintiff was restricted from concentrated exposure to extreme heat, high humidity, and temperature extremes. (Tr. 321). He reported that Plaintiff needed to use a cane to walk "any significant distance." (*Id.*). As support for his opinion, Dr. Sipple relied on plaintiff's restricted range of motion and the level of pain it produced; tenderness on palpation; biomechanical joint dysfunction at L4-S1; decreased sensation in the lower extremities; and a positive straight leg raising test. (Tr. 322). Dr. Sipple commented that plaintiff's activity level was considered low and that the functional rating index questionnaire she had completed indicated a score of 33 on a scale of 0 to 40. (Tr. 323).

On the functional rating index dated October 14, 2008, plaintiff reported that she was in severe pain; she needed assistance with personal care; she could not work; she was in pain 75%

of the day; and she had increased pain with any amount of lifting, with all walking, and after standing for thirty minutes. (Tr. 324). Plaintiff also completed a pain form that same date where she rated the pain she was presently experiencing as "8" on the 1-10 pain intensity scale. (Tr. 325). She indicated that the pain was constant whether she was sitting, standing or lying down. (*Id.*).

Dr. Martin Fritzhand, M.D., a state agency medical consultant, examined plaintiff in October 2007. (Tr. 288-95). Plaintiff reported to Dr. Fritzhand that she had sustained an injury to her low back in 2000. (Tr. 288). While chiropractic treatment had helped, her condition had waxed and waned over the years and had worsened since April 2007. She had received no other medical care. Plaintiff complained of constant sharp to dull low back pain radiating to the hips and legs. The pain was exacerbated by prolonged ambulation or standing or other movements. Plaintiff also complained of weakness involving both legs, numbness of the calves and feet, and occasional instability and falls. She was not seeing a physician at the time of the examination, she was on no medication, and she had not required hospitalization. Dr. Fritzhand reported that plaintiff ambulated with a normal gait and was comfortable in both the sitting and supine positions. (Tr. 289). He reported that plaintiff was obese at 5 feet 5 inches tall and 156 pounds, but he opined that her obesity did not contribute to her symptoms. (Tr. 288, 290). He noted the odor of alcohol, and plaintiff reported that she had consumed approximately four beers prior to her noon appointment. (Tr. 289).

On neurological examination, plaintiff's Achilles tendon reflexes were absent bilaterally and patellar tendon reflexes were brisk bilaterally. There was no evidence of muscle weakness or atrophy. There were no joint abnormalities. Plaintiff had slight difficulty with forward bending

at the waist to 70 degrees, and she could stand on one leg.  Extension of the spine was

diminished to 20 degrees and lateral flexion of the spine was normal to 30 degrees bilaterally.

Range of motion of the hips with the knees flexed was slightly diminished to 90 degrees

bilaterally.  Straight leg raising was decreased to 50 degrees bilaterally.  Plaintiff had diminished

sensation to pinprick and light touch over the left lower extremity, the lateral right lower leg, and

the entire right foot.  (Tr. 290).  Dr. Fritzhand opined there was no evidence of nerve root damage

as changes plaintiff exhibited on neurological examination could be attributed to "an underlying

peripheral neuropathy."  (*Id.*).  Dr. Fritzhand attached current x-rays, which showed a normal

lumbosacralspine.  (Tr. 290-91).

Dr. Fritzhand diagnosed plaintiff with chronic low back pain, ethanol abuse by history

with nutritional peripheral neuropathy, and exogenous obesity.  (Tr. 289).  Dr. Fritzhand

concluded that plaintiff could perform "a moderate amount of sitting, ambulating, standing,

bending, kneeling, pushing, pulling, lifting and carrying heavy objects," and she would have no

difficulty reaching, grasping, and handling objects.  (Tr. 290).

Bryan Hosier, D.C., interpreted a lumbar spine MRI taken on May 8, 2009, as showing an

L5-Sl left paracentral disc herniation effacing the left S1 proximal nerve root and encroaching on

the neural foramen bilaterally; right paracentral L4-5 disc herniation encroaching on the right

lateral recess with right L5 nerve root effacement; broad-based central L3-4 subligamentous

protrusion without evidence of neural compression, with a focal central annular tear; and

moderate discogenic spondylosis involving L3 through L5-S1 with degenerative facet

arthropathy resulting in mild biforaminal stenosis.  (Tr. 328).

## II. Psychological Consultants

On November 2, 2007, Dale Seifert, MS Ed., a licensed psychologist, interviewed and tested plaintiff at the request of the state agency. (Tr. 296-301). Plaintiff complained of occasional depression but no anxiety. A mental status examination revealed that plaintiff's affect was flat, but she had adequate eye contact and she showed no vegetative signs. She related relatively well during the interview. Plaintiff reported drinking 12 to 24 beers daily. (Tr. 296-97). Mr. Seifert diagnosed dysthymic disorder and alcohol abuse. He assigned plaintiff a GAF score of 65.[2] (Tr. 300). He found that plaintiff had mild limitations in the ability to relate to others, understand and follow instructions, and maintain attention to perform simple, repetitive tasks. (Tr. 301). Mr. Seifert found plaintiff was moderately limited in her ability to withstand the stress and pressures associated with day-to-day work activity "because of her depression." *Id.*

On November 19, 2007, Dr. Karla Voyten, Ph.D., a state agency psychological consultant, reported that plaintiff did not have any severe mental impairment and that she had "no work related limitations in regards to mental health." (Tr. 303, 315). Dr. Voyten opined that plaintiff was mildly limited in her activities of daily living; mildy limited in her ability to maintain her social functioning; and mildly limited in her ability to maintain concentration, persistence or pace. (Tr. 313). Dr. Voyten found she had no episodes of decompensation, each of extended duration. (*Id.*). Dr. Voyten disagreed with Mr. Seifert's opinion about plaintiff's

---

[2]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with scores of 61 to 70 as having "some mild" symptoms who is "generally functioning pretty well." *See* DSM-IV at 32.

ability to withstand the stress and pressures of daily work activities as plaintiff had an adequate

mental status exam and activities of daily living, and she had no history of mental health

treatment. (Tr. 315). Dr. Bonnie Katz, a state agency consultative psychologist, affirmed Dr.

Voyten's opinion in January 2008. (Tr. 318).

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified at the administrative hearing that she is 5 feet 5 ½ inches tall and her

weight at that time was around 142 pounds. (Tr. 29). Prior to September 2006, plaintiff's

employer noticed that her legs were bothering her and advised her to return to the chiropractor.

(Tr. 32-33). She stopped working in September 2006, when she was laid off for the winter as

was customary in her line of work. (Tr. 33). She received unemployment compensation

beginning in December 2006. (Tr. 33). She went back to work for a day and a half in July 2007,

but her legs gave out and she could not do her job. (Tr. 36). Plaintiff continued to receive

unemployment compensation until two weeks prior to the hearing, and she last looked for a job

one week prior to the hearing. (Tr. 31).

Plaintiff testified that she cannot work due to her back. (Tr. 36). She has pain in her

lower back and legs, and her legs are "numb all the time." (Tr. 37). She rated her pain as 7-8 on

the 1-10 pain intensity scale. *Id.* She sometimes takes over-the-counter pain medications

(Tylenol and Advil), which help "a little bit." (Tr. 37-38).

Plaintiff testified that she can lift a gallon of milk with both hands. (Tr. 38). She

estimated she can possibly lift 10 pounds, but not every hour. She can stand for about one to two

hours and sit for about 30 minutes, although she also testified she would have to sit for an hour

after standing for two hours. (Tr. 40-41). Plaintiff also testified that she might have to lie down

after standing. (Tr. 41). She can walk about 200 feet at a time. (*Id.*) She can bend and reach with difficulty, and she has difficulty climbing stairs. (Tr. 42). She has fallen in the past due to weakness in her legs. (Tr. 40).

Plaintiff testified that she did not have any kind of insurance to cover her injuries or her physical complaints from 2000 to the present. (Tr. 50). She stated that she did not see Dr. Sipple any more because she could not pay for it. (Tr. 43).

Plaintiff is able to read and watch television without difficulty concentrating. (Tr. 43). She cooks dinner, does laundry, makes the bed, sometimes washes dishes, grocery shops once a month, dresses herself with some difficulty, and mows with a riding mower every two weeks. (Tr. 44-45). When she does the laundry, she feels worse the following day. (Tr. 37, 44-45).

Plaintiff smokes about a pack of cigarettes every day and drinks roughly twelve beers daily. (Tr. 64).

### THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The VE testified as to plaintiff's past relevant work as a construction worker, which is classified as heavy, semi-skilled work, and her past relevant work as a bar waitress, which is classified as light, semi-skilled work. (Tr. 66). The ALJ then posed a series of hypothetical questions to the VE to determine whether jobs existed which could be performed by an individual of plaintiff's age, education and work experience who could do light work with the following restrictions: no repetitive reaching; occasional bending and squatting; no crawling or climbing of ladders or scaffolds; and the individual can sit for only one hour at a time with the need for a five-minute break every hour. (Tr. 66-68). Based on the hypothetical posed by the ALJ, the VE opined that plaintiff would be unable to return to her past relevant work. The VE

12

identified positions categorized as light work with an SVP[3] of "2" which an individual with the limitations the ALJ identified could perform, such as information clerk, counter attendant and counter/rental clerk.  (Tr. 67-68).

## STATEMENT OF ERRORS

Liberally construing plaintiff's pro se statement of errors in her favor, plaintiff challenges the ALJ's finding of non-disability on the following grounds:  (1) His determination that she is capable of performing a range of light work is not supported by substantial evidence[4]; (2) the ALJ erroneously discounted the opinions issued by the chiropractors, Dr. Sipple and Dr. Hosier, simply because they are "other sources" and not "acceptable medical sources"; and (3) in discounting plaintiff's credibility, the ALJ erroneously failed to take into account plaintiff's inability to obtain medical treatment because of her lack of financial resources.  (Doc. 16).

The Commissioner argues that substantial evidence support the ALJ's determination of non-disability.  The Commissioner claims that the ALJ fully considered all of the medical evidence, including the objective findings rendered by the only acceptable medical source, Dr. Fritzhand; the limited objective findings of the chiropractor Dr. Sipple, whom the ALJ appropriately recognized as an "other source" under the Social Security Regulations; plaintiff's 2007 lumbosacral x-ray and 2009 MRI; and all of the medical opinions rendered in this case. The Commissioner claims that the ALJ was entitled to give Dr. Sipple's opinion little weight

---

[3]SVP is "Specific Vocational Preparation," which is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  It is a component of information pertaining to workers characteristics found in the *Dictionary of Occupational Titles* (U.S. Department of Labor, 1991).  Level 2 means "anything beyond short demonstration up to and including 1 month."

[4]Plaintiff misinterprets the ALJ's opinion as concluding she is capable of performing her past relevant work, when in fact the ALJ determined she could not perform her past relevant work. (Tr. 20).

because it was inconsistent with other evidence, it was not supported by Dr. Sipple's objective findings, and the opinion relied on plaintiff's self-reporting.

In addition, the Commissioner claims the ALJ was entitled to reject plaintiff's complaints because they were disproportionate to the findings of Dr. Sipple and Dr. Fritzhand; plaintiff had not sought any medical treatment for her back, even at the emergency room, and the facts do not indicate that this was due to a lack of financial resources; plaintiff had stopped working due to the cyclical nature of her job rather than because of her alleged disability, and she had sought unemployment benefits shortly before the hearing, which is inconsistent with any claim of total disability; and plaintiff's activities of daily living are inconsistent with her allegations of disabling pain.

Finally, the Commissioner argues that the ALJ reasonably decided to accept the opinions of the state agency reviewing psychologists that plaintiff does not have any work-related mental limitations.

## OPINION

Because plaintiff is proceeding pro se, the Court has carefully reviewed the ALJ's decision to determine whether the ALJ's critical findings of fact were made in compliance with the applicable law and whether substantial evidence supports those findings. The Court has considered the issues raised by plaintiff as well as those presented by defendant's responsive memorandum. The Court finds after a careful review of the record that the decision of the ALJ is supported by substantial evidence and should be affirmed.

14

### I. The ALJ's Determination That Plaintiff Does Not Suffer From a Severe Mental Impairment Is Supported By Substantial Evidence

The Court begins its review with the ALJ's determination that plaintiff suffers from severe impairments of degenerative disc disease of the lumbar spine and exogenous obesity, but she does not suffer from a severe mental impairment. (Tr. 13-14). The ALJ acknowledged that the consultative examining psychologist, Mr. Seifert, diagnosed plaintiff with a dysthymic disorder and alcohol abuse in November 2007. However, the ALJ found these impairments were not severe because the medical evidence establishes only "a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." (Tr. 14, citing *Farris v. Secretary*, 773 F.2d 85, 90-91 (6th Cir. 1985)). The ALJ determined that the record supported only mild restriction in activities of daily living; mild difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration. (Tr. 14).

The ALJ's determination that plaintiff does not suffer from a severe mental impairment is supported by substantial evidence. Plaintiff denied any work-related limitations resulting from a mental impairment; plaintiff has never sought treatment or been prescribed medication for a mental impairment; and the medical evidence supports only mild limitations on plaintiff's overall mental functioning. Although the consultative examiner Seifert found that plaintiff had moderate limitations in the ability to withstand the stress and pressures associated with day-to-day work activity "because of her depression" (Tr. 301), his opinion is not supported by sufficient evidence. Mr. Seifert did not explain how he reached his conclusion that plaintiff was limited to this extent, and the basis for his conclusion is not clear from his report. (Tr. 296-301). Plaintiff reported to Mr. Seifert that she only "occasionally" felt depressed, and she denied that she felt

15

anxious or needed counseling. (Tr. 298-300). Moreover, Dr. Voyten, the state agency psychologist, rejected Mr. Seifert's finding that plaintiff was moderately limited as unsupported by the evidence. Dr. Voyten concluded that the evidence supported only a mild range of overall mental functional limitation. Dr. Voyten noted that the results of plaintiff's mental status examination were adequate; plaintiff engaged in adequate activities of daily living; and she had no history of mental health treatment or inpatient psychiatric hospitalization. (*Id*. at 14-15, citing Tr. 315). Thus, the ALJ reasonably relied on Dr. Voyten's opinion as consistent with the overall record and did not err by finding plaintiff did not have any severe mental impairment.

## II. The ALJ's RFC Finding is Supported by Substantial Evidence

Plaintiff indicates that the ALJ erred by discounting the medical opinions of two chiropractors in this case, Dr. Sipple and Dr. Hosier, on the ground they are not "acceptable medical sources." For the reasons explained below, the Court finds that the ALJ did not err by discounting the opinions of the chiropractors and relying instead on the opinion of Dr. Fritzhand, a licensed physician, to determine plaintiff's RFC.

SSR 06-03p provides that the Commissioner will consider all available evidence in an individual's case record, including evidence from medical sources. The term "medical sources" refers to both "acceptable medical sources" and health care providers who are not "acceptable medical sources." *Id*. (citing 20 C.F.R. § 404.1502 and § 416.902). Licensed physicians and licensed or certified psychologists are "acceptable medical sources." *Id*. (citing 20 C.F.R. § 404.1513(d)(1) and § 416.913(d)). Chiropractors are not "acceptable medical sources" and instead fall into the category of "other sources." *Id*. (citing 20 C.F.R. § 404.1513(d)(1) and § 416.913(d)).

16

Only "acceptable medical sources" as defined under 20 C.F.R. § 404.1513(a) and §

416.913(a) can provide evidence which establishes the existence of a medically determinable

impairment, give medical opinions, and be considered treating sources whose medical opinions

may be entitled to controlling weight. *Id.* Although information from "other sources" cannot

establish the existence of a medically determinable impairment, the information "may provide

insight into the severity of the impairment(s) and how it affects the individual's ability to

function." *Id.* Factors to be considered in evaluating opinions from "other sources" who have

seen the claimant in their professional capacities include how long the source has known the

individual, how frequently the source has seen the individual, how consistent the opinion of the

source is with other evidence, how well the source explains the opinion, and whether the source

has a specialty or area of expertise related to the individual's impairment. *Id. See also Cruse v.*

*Commissioner of Social Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). Not every factor will apply in

every case. SSR 06-03p. "Although there is a distinction between what an adjudicator must

consider and what the adjudicator must explain in the disability determination or decision, the

adjudicator generally should explain the weight given to opinions for these 'other sources,' or

otherwise ensure that the discussion of the evidence in the determination or decision allows a

claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may

have an effect on the outcome of the case." *Id.*

Here, the ALJ accepted the opinion of the consultative examining physician Dr.

Fritzhand, an "acceptable medical source," that plaintiff can perform a moderate range of

exertional activity. The ALJ determined that the opinion is well-supported by the record and

supports an RFC for light work with certain restrictions. The ALJ rejected the contrary opinion

of Dr. Sipple, plaintiff's chiropractor. The ALJ acknowledged that Dr. Sipple is not an

"acceptable medical source" who can provide a "medical" opinion. (Tr. 17, citing 20 C.F.R. §

404.1527 and § 416.927). The ALJ noted that Dr. Sipple's opinion could be considered only to

the degree it aids in the understanding of how plaintiff's impairments affect her ability to work.

(*Id.*). The ALJ decided to give Dr. Sipple's opinion little weight because he found the opinion to

be inconsistent with the greater weight of the overall evidence. (*Id.*).  The record substantially

supports the ALJ's determination.

First, Dr. Sipple's opinion is inconsistent with Dr. Fritzhand's findings.  Dr. Sipple and

Dr. Fritzhand found comparable restrictions on plaintiff's range of motion.  (Tr.  289, 322).

However, whereas Dr. Sipple concluded that plaintiff could not work largely on the basis of

those results, Dr. Fritzhand opined that plaintiff could perform a moderate amount of sitting,

ambulating, walking and lifting.  (Tr. 290).  Moreover, Dr. Fritzhand found that plaintiff's

neurological examination was completely normal except for diminished pinprick and light touch

over the left lower extremity, the lateral aspect of the right lower leg, and the entire right foot.

(Tr. 289).  Neurological evaluation of the lower extremities showed no evidence of muscle

weakness or atrophy, and there was no evidence of joint abnormality or nerve root damage.  (Tr.

289-290).  The ALJ could reasonably rely on Dr. Fritzhand's opinion, which was well-supported

by the objective medical findings, to reject Dr. Sipple's opinion of total disability, which was not

supported by reliable objective evidence that corroborated plaintiff's complaints of pain.  *See*

*Blacha v. Secretary of Health and Human Services,* 927 F.2d 228, 231 (6th Cir. 1990) (muscle

atrophy is typically associated with severe pain); *Jones v. Secretary of Health and Human*

18

*Services,* 945 F.2d 1365, 1369-70 (6th Cir. 1991) (reliable medical evidence of pain includes muscle atrophy, reduced joint motion, muscle spasm, and sensory and motor disruption).

The ALJ also rejected Dr. Sipple's opinion on the ground that it relied too heavily on plaintiff's self-reporting of her subjective symptoms and limitations. (Tr. 17). Substantial evidence supports the ALJ's decision in this regard. To aid in assessing plaintiff's condition, Dr. Sipple had plaintiff complete an index on which she self-rated her capacity to work and the degree of pain she experienced when performing various activities. (Tr. 324). Dr. Sipple also had plaintiff complete a form on which she indicated the degree of pain she experienced. (Tr. 325). Dr. Sipple made repeated references to plaintiff's pain levels in his objective findings, and he commented on plaintiff's self-reported activity level and score on the functional rating index. (Tr. 322-323). The ALJ was entitled to reject Dr. Sipple's opinion as too dependent on plaintiff's subjective complaints of pain and self-reported limitations and to instead accept the opinion of Dr. Fritzhand. *See* 20 C.F.R. 404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled.").

Finally, the ALJ noted that plaintiff had an MRI of the lumbar spine on May 8, 2009, which was interpreted by Dr. Hosier. (Tr. 17). The ALJ questioned the reliability of the interpretation given that Dr. Hosier is a chiropractor, but the ALJ nonetheless took the results into consideration. (*Id.*). The ALJ determined that nothing in the mild to moderate MRI findings would call into question Dr. Fritzhand's assessment. There is no evidence in the record that the findings of the MRI impose greater functional limitations on plaintiff than those found by Dr. Fritzhand. Thus, the ALJ's determination in this regard must stand.

In short, the ALJ's decision to accept the opinion of Dr. Fritzhand, an "acceptable medical source," as to the degree of plaintiff's limitations is supported by substantial evidence. The ALJ considered the opinion of plaintiff's chiropractor, Dr. Sipple, who is not an "acceptable medical source," in accordance with the Regulations and reasonably determined that Dr. Sipple failed to produce sufficient clinical and objective findings to support his conclusion that plaintiff is unable to work. Thus, the ALJ's RFC determination is supported by substantial evidence and must stand.

### III. The ALJ's Credibility Finding Is Supported by Substantial Evidence

In light of the ALJ's opportunity to observe the individual's demeanor at the hearing, the ALJ's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk v. Sec. of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981). "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

Social Security Regulation 96-7p describes the requirements by which the ALJ must abide in rendering a credibility determination:

> It is not sufficient for the adjudicator to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain *specific reasons* for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

(emphasis added). The ALJ's credibility decision must also include consideration of the following factors: 1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. § 404.1529(c); SSR 96-7p.

Here, the ALJ properly assessed plaintiff's credibility in light of the above requirements. A review of the ALJ's decision shows the ALJ considered a number of factors in determining that plaintiff was not entirely credible. First, the ALJ determined that plaintiff's description of her symptoms and complaints appeared to be out of proportion to the medical evidence. (Tr. 19). Second, the ALJ noted plaintiff's failure to obtain medical care for her back. The ALJ found that the record did not document any treatment by a physician for plaintiff's back; there were no

21

emergency room visits for intractable pain as would be expected for disabling pain; the record did not disclose that plaintiff had attended physical therapy sessions or received epidural injections; plaintiff testified that she takes only over-the counter pain relievers for her back pain; and while Dr. Sipple stated that plaintiff needed a cane for any significant walking, there is no evidence that a cane had been medically prescribed for her. (Tr. 19). Third, the ALJ relied on plaintiff's work history and benefits application history to find she was not entirely credible. Specifically, plaintiff testified that she had stopped working in September 2006 because she was laid off and had been unable to return to work because of her disability; she had continued to receive unemployment compensation until two weeks prior to the hearing; and she had last looked for a job one week prior to the hearing. The ALJ noted that an individual must state they are able and willing to work in order to receive unemployment compensation, a position which is inconsistent with plaintiff's representations to the SSA that she cannot work. (Tr. 19). Fourth, the ALJ found plaintiff's description of her daily activities to be inconsistent with her allegations of disability. The ALJ noted that plaintiff cooks, does laundry, makes her bed, washes dishes, goes to the grocery store, and occasionally cuts the grass using a riding mower. The ALJ reasonably found that the ability to engage in these activities is not indicative of pain or symptoms so severe that all work activity would be precluded. (*Id*.). Finally, the ALJ found no evidence that plaintiff has experienced adverse side effects from medication or treatment which would prevent her from working. (Tr. 19-20).

There is no evidence the ALJ misconstrued plaintiff's testimony, took her testimony out of context, or placed undue weight on her daily activities in determining plaintiff's RFC. Nor does the evidence show the ALJ erred by failing to properly take into account plaintiff's lack of

financial resources. Plaintiff has not provided any evidence that she attempted to access free or subsidized medical services at a hospital or clinic and was denied such access. Moreover, plaintiff continued to smoke a pack of cigarettes per day and drink at least a 12-pack of beer per day during the period she claims she was disabled. The pursuit of these expensive habits belies any claim that plaintiff could not afford any type of treatment or examination, other than several months of chiropractic treatment, during the time period in question. Thus, the ALJ did not err by failing to take plaintiff's financial situation into account when assessing her credibility. The ALJ's decision clearly reflects that he properly considered the required factors in making his credibility determination and that his decision is substantially supported by the record evidence.

## CONCLUSION

The ALJ considered and evaluated all of the opinions and evidence in the record, including the opinions of and findings of the "acceptable medical sources" and the evidence provided by the "other sources." The ALJ also thoroughly assessed plaintiff's credibility. The record contains substantial evidence to support the ALJ's conclusion that plaintiff is able to perform a significant number of jobs that exist in the national economy and is therefore not disabled. For these reasons, the ALJ's decision is supported by substantial evidence and should be affirmed.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED.**

Date: 7/22/2011

Karen L. Litkovitz
United States Magistrate Judge

23

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CONNIE GUMBERT,  
    Plaintiff

  vs

COMMISSIONER OF  
SOCIAL SECURITY,  
    Defendant

Case No. 1:10-cv-333  
Dlott, J.  
Litkovitz, M.J.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to these proposed findings and recommendations within **FOURTEEN DAYS** after being served with this Report and Recommendation ("R&R"). That period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within **FOURTEEN DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

24

■ Complete items 1, 2, and 3. Also complete
  item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

A. Signature

X ☑ Agent
  ☐ Addressee

B. Received by ( Printed Name)     C. Date of Delivery

1. Article Addressed to:

Connie Gumbert
3843 S.R. 756
Felicity, OH 45120

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☑ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)            ☐ Yes

2. Article Number
   (Transfer from service label)

7003 2260 0002 6723 3050

PS Form 3811, August 2001        Domestic Return Receipt        102595-02-M-1540